Scott Zarin for Defendants S3 Holding and Olivia Miller who were appellants in this case. And I reserve five minutes for rebuttal. In 2014, in August of 2014, the plaintiff in this case who is an appellee at Seattle Pacific Industries entered a license with Defendant S3 Holding. Olivia Miller was the guarantor on that license. The license enabled the defendants to manufacture, sell, and market footwear under the plaintiff's trademarks. They did so for approximately two years, through 2015, 2016. With no incident, they complied with the terms of the license. They paid the licensing fees that were required. The agreement required a minimum guarantee payment of royalties and a minimum guarantee of advertising, for advertising fees, in the event that a certain minimum guarantee of sales were not met. That occurred for 2015, 2016. In 2017, there had been, the defendants did not make payment for the, I think it was the end of, for their 2017 minimum guarantee payment. And the reason they didn't do that was because they had submitted designs for the footwear to the plaintiff for review, which they were required to do under the agreement. And plaintiff originally approved those designs and subsequently decided they didn't like those designs and disapproved the designs. So therefore, defendants were not able to sell, they were hardly able to sell any of the shoes because they didn't have approvals to manufacture them. Well, let me ask you that. Okay, so this is cross motions for summary judgment, right? It's undisputed that your client stopped making royalty payments, correct? Correct. So that's, that's undisputed. And it's undisputed that the plaintiff has the trademark. Not what was in their head, not what was in their head. You do have a trademark? You don't, right? No, there's, the trademarks that were licensed to defendants, to S3 Holdings and Olivia Miller, were two trademarks. UB and Union Bay. Now, a trademark, you can have a trademark with respect to certain goods and not other goods. So who's the owner of the trademark? The trademark, the owner of the trademark is SPI, except the rub here is that the trademarks were, the defendants believed that SPI had ownership rights in the trademarks with respect to footwear and later discovered or became suspicious that they did not at the time they entered the license have any, have those trademarks rights with respect to footwear, but only have them with respect to other types of apparel. All right, well, let's, okay. I think those two things in my mind are undisputed, but I want you to explain why plaintiff's approval of your 2017 designs is a violation of the licensing agreement and that therefore the plaintiff is stopped from seeking enforcement of your obligations under the agreement. Is not the approval or disapproval of the designs plaintiff's prerogative under the agreement? Well, it is plaintiff's prerogative, except that it's, that prerogative is, is somewhat circumscribed by the provision, which, which deals with it. And that's provision of standard, part of the standard provisions of the agreement in provision six. And I do note here, your honor, that I think in my brief, I had cited provision six B except it's really a subsection A of the, of the, of provision six that, that requires that, that circumscribes in some way, the discretion that the, that the licensor has. And, and that provision, that six A states that license, licensee agrees to conform at all times to such standards as licensor may reasonably direct from time to time, including, but not limited to standards relating to design, manufacturing, packaging, advertising, and promotion of the licensed products. So under that provision, the, the, the SPI had, had an obligation to, to, to approve or disapprove the designs reasonably. And if they had done that reasonably, they would have had discretion to refuse to allow those designs to go forward. In other words, Can I ask a follow-up question about that counsel? I didn't mean to cut you off. No, no problem. I'm trying to figure out what was, what was unreasonable. Is it the interval of time between approval and disapproval or is it, what, what, what is it? Well, it was, no, is it, well, I mean, there, there are other, there's a, in the agreement, you know, as, as you may have seen in six B, there's a requirement that there, that the, the disapproval must occur within 10 working days. Now there were many, many different designs that S3 Holdings submitted to SPI for approval. And some of those were, were, were, were disapproved within 10 working days. Some of them were not. So, so the answer to your question in short is, is both. So, so, and, and this came out later in discovery after the, the, the court issued a summary judgment ruling. But the other issue as, as you noted, or as, as is indicated in the briefs is, is that the design should not have been approved because they were in fact satisfactory. Now, if, if SPI had come to, to S3 Holding and said, you know, these designs are, are, are insufficient for X, Y, Z reasons, and given, given S3 Holding an opportunity to remedy them in some way that may have been sufficient, arguably, it's a, it's a question of fact, of course, but the fact is that that never happened. So those two things together, and looking at, at, at the requirements of, of, of the provision 6A required, and 6B together, you know, in tandem, required the discretion to be used based upon the reasonableness of, of SPI, SPI, which it didn't do in either of those, you know, either of those ways that I just articulated. I want to take you back to when you, your comment about that your clients became suspicious that plaintiffs had not been using its Union Bay and UB trademarks on footwear and therefore did not have ownership rights in these trademarks as to footwear. Can you elaborate on how not using trademarks creates a genuine dispute of material fact regarding plaintiffs' ownership of those trademarks? I can, although I, I, yes, if, if, if the, if the plaintiff had ownership rights in, in trademarks with respect to footwear, then, then, you know, it would not be inconsistent for, for them to have, have represented impliedly in their license that they did. But if they, if they didn't have those rights, and they only, only had those rights with respect to other types of apparel, then, then it would, would have been, it would have been, you know, false and fraudulent in some respect for them to, for them to have made those representations by issuing a license to S3 to produce footwear with those, with, with those trademarks. In other words, in other words, by issuing a license to, for S3 holding to use the trademarks on footwear, the, the S3 holding had, had every, it was reasonable for S3 holding to assume that those rights were in fact owned with respect to footwear by SPI. But if it turns out that they were not, then that license could not have been issued at all. It can only have been issued with respect to apparel, which it was not because S3 holding was not licensed to produce apparel for SPI. There were other, there were third parties that were, and, and, and, and I believe that S3 holding was aware of that at the time. All right. Well, I didn't really follow that. I, that was not really persuasive to me about how that creates a genuine dispute regarding ownership. But let's say, I'd like you to explain why you're arguing that the district court erred and not allow any additional discovery before the motion for summary judgment ruling, when you did not even file a rule 56D motion, the vehicle for a non-movement of MSJ to request additional time for discovery. Well, I, I did in my motion indicate that additional discovery was, was, was required. So although I formally didn't file a separate motion, I did in fact make that request. And I think that there's, there's a ninth circuit case, which I, which I cited in, in which I indicated that, that there's a requirement that additional, that time for discovery be, be, be given under rule 56, if, if there are, there are issues of fact. And it's not an optional thing that the court can decide not to do. Maybe I'm missing why you would need additional discovery in any case. Is it, is it not correct that it's undisputed that you fail to make the guaranteed minimum royalty payment, the advertising payment, or for that matter, any other payment to SBI after January 1st, 2017 in violation of the contract? That's true. That is indisputed. Is it also undisputed that you continue to sell the footwork that, the footwear that was the subject of the license agreement after the termination of the license agreement? That is undisputed as well, but, but. And is it also undisputed that you did so without providing a detailed inventory to for authorization to sell such footwork after the termination of the license agreement? Well, I believe that we did provide that, although I think that it was provided later than was, was required in the agreement. Okay. All right. So that sounds like the kind of situation where a court can resolve summary judgment. And why, why do you think you needed more discovery? Well, if I could just back up a step for a moment, there were two ways in which there was an inconsistency. The first inconsistency, as Judge Callahan discussed, was, was the ownership issue. And, and on that issue, there was an, it was implied by the granting of the license that, that, that there, that plaintiff at SPI had ownership rights in the, in the goods as with respect to footwear. But that turns out, it turns out that that may not have been the case. And during summary judgment, with the summary judgment motion, there was, there was evidence produced which, which, which supported the suspicion. And those pieces of evidence were the registrations on, on the footwear, on the trademark registrations, in which footwear was listed, the fact that no depositions had taken place yet at that point. And importantly, there was a piece of evidence, which was an article from the Puget Sound Business Journal in, in which there were interviews with some principals of SPI, in which they And one of those new areas of business was, was footwear. And, and those, that article, I think, was published in around 2003 or 2004. But prior, the trademark registrations, which were issued for footwear, were issued three or four, or maybe five years before that. So when, when SPI obtained the registrations, it made fraudulent allegations to the trademark office that it had ownership rights with respect to, to footwear, when in fact, it, it did not. So, so the discovery was necessary on that point to, to determine whether or not there had in fact been any, any manufacturing and sale of footwear with these trademarks on them. That's, that's point number one. Point number two, the other, the other factual issue that was at issue here is that the, the, the, the, what the district judge, what Judge Lassenig had said was that there was an inconsistency between the, the, the payment, there was no inconsistency between the payment obligation in the agreement and the, the, the approval of footwear design obligations. Now, that was not what the, what we had argued to the district, or what we had argued, as I mentioned before, was there was an inconsistency in the approval, in the approval versus, which later turned into a disapproval. So, there would need to be discovery on that very question of whether there had been approvals, which later turned into disapproval. And I must add that, that the, the summary judgment motion and, and the response and reply briefs were filed prior to the time that depositions were actually taken of three witnesses of SPI and, and coming out of at least one of those depositions was evidence that could be construed, which indicated that, in fact, there had been a reversal of, of the, the, the designs and that those reversals were not justified and therefore were not reasonable under the, under provision 6A of the, of the licensing agreement. So that discovery occurred, but it occurred after the court had issued its summary judgment ruling. So, and, and if the summary judgment motion had been made after that discovery was complete, I believe that the result would have, would have turned out differently because we could have submitted deposition testimony as, on the second issue regarding the approvals and we, we, we could have, and, and, and other deposition testimony on a subject of ownership on which there was also deposition testimony from one of the witnesses, which indicated that, that, that defendant's suspicions were in fact correct, that they did not have ownership rights in the, in the marks with respect to footwear at the time they filed the trademark applications. Um, it doesn't appear that my colleagues have any additional questions. Basically your time's expired, but I'll give you two minutes for rebuttal. Okay. Thank you. All right. We'll go to the appellee or respondent, whichever you want to be today. May it please the court. My name is Mark Levy and I represent the, we'll, we'll go with respondent with the respondent Seattle Pacific Industries, uh, the owner of the Union Bay Fashion Brand. Um, uh, this is an appeal of a grant of summary judgment in favor of SPI against the licensee who as Judge Rapoff noted, admittedly failed to make guaranteed royalty payments in 2017. And then admittedly continued to sell the branded merchandise after SPI terminated the breach. Uh, the district court granted summary judgment to SPI for the undisputed guaranteed royalties due under the license for 2017, uh, in the amount of $160,000 and damages for the licensees undisputed post-termination infringing sales of merchandise in 2018 of 31,000 and change. So they basically say that's a double recovery and you say it's not correct. That's correct. And it's the royalties, the others, the infringing sales, correct, but it's not a double recovery quite obviously because the, um, uh, the awards address two different injuries, uh, caused by two different wrongs. There's the loss guaranteed royalties in 2017 based on the breach of contract. And the important thing there to re to recognize is the, is the upon termination, uh, the 2017 guaranteed royalties were accelerated as of the termination date. So 2017 was covered. And so precisely to avoid any issues about double recovery, we, this is very important. We did not seek trademark damages for the unauthorized sales in the rest, in the second half of 2017. We restricted the trademark damages to 2018 precisely to avoid Mr. Zarin making this argument about double recovery. Okay. Assuming that's correct. I guess you asked for something else. I think trouble damages or something that the district court denied, but you're not, we're not reviewing that here, right? That's correct. We, we did not cross appeal on, on, on that matter. Let me ask you this. I want to, I, something that I had asked, um, appellant, well, defendant appellants argued that plaintiff's refusal to answer discovery regarding the use of the trademarks made them suspicious that the plaintiffs did not own the trademarks. I think that, and, uh, in the opening brief at five, can you explain why this does not create a genuine issue, a genuine dispute of material fact regarding plaintiff's ownership of the trademarks? Uh, yeah, well, because the only issue on appeal, uh, before you with the, that this could possibly be relevant to is whether the district court properly, uh, uh, denied, uh, the, uh, uh, respondents, I'm sorry, the appellants, uh, equitable estoppel affirmative defense. And, you know, one of their theories, uh, that they had presented to the district court, which was rejected was that because that somehow this in this alleged inconsistency on the ownership issue created an equitable estoppel. So that's the context for how this could possibly create, potentially create a genuine issue of fact. The problem is that the, it, it doesn't even get started because the first element of an equitable estoppel defense is an admission statement or act that's inconsistent with a claim afterward asserted. The statement they're saying that what they're really saying is the statement or ownership of the trademark was false. And that there, what it really is, is kind of a fraud in the inducement type of theory. Uh, but that's not, that defense was never pleaded. It's not part of the case. Um, and, and any facts, any discovery on this issue of ownership, uh, uh, could not create a genuine issue of material fact on the equitable estoppel issue because SPI's statement in the consistent with the claim that are asserted against, uh, the, uh, appellants in this case. So it, it, the, this whole issue about the trademark ownership is, is nothing to do with the issue with court. It has everything to do with a fraud in the inducement type of defense that, uh, the, uh, that the appellants did not make in the case. Thank you. Um, that you also have the order, uh, on the deadlines and, uh, the, I guess the district court basically, uh, interpreted its own orders and said, uh, it wasn't a dispositive motion. And so how do, what's your position on that? No, thank you, your honor. Happy to address that. Yeah, specifically, um, the, um, appellants are appealing the district court's denial of their motion to amend that was filed four months after the deadline for amending pleadings in the court scheduling order. And, uh, that was not an abuse of discretion. Um, and, and I think here it's, it's useful to kind of walk down the path a bit. And I think it's pretty evident why this argument, uh, doesn't hold water. The scheduling order, which is at ER 31, uh, says that the deadline for amending, says the deadline for amending pleadings, and it sets it as October 3rd, 2018. Um, under rule 15, no, no, I'm sorry. So the appellants interpret what they are trying to say is they interpret the order as that's the deadline for amending pleadings without leave of court. That's what that is. Okay. And then they say that the deadline for amending pleadings with leave is really the dispositive motion. So let's test that. Okay. Um, so under rule 15, the deadline for amending pleadings without leave of court is set by rule. It's 21 days after service of, um, uh, and, and as, uh, the appellants filed their answer on March 23rd, 2018. That's the supplemental excerpts, uh, page 92. The district court issued its scheduling order, the one that we're talking about on May 1, 2018, after the rule 15 period for amending without leave had already expired. Thus, at the time that the district court set the deadline for amending pleadings, any amendment would require leave of court. And it's certainly not reasonable to read that deadline as the court suddenly reopening a deadline that had already closed without any comment. That makes no sense. In addition, the deadline for amending pleadings was set two months before the close of discovery to allow the parties a full and fair opportunity to investigate all claims and defenses. You can, um, and that again is in, um, uh, uh, excerpt from record 31. If the dispositive motion deadline was actually the deadline for amendment with leave that at the time that was January 1, 2019, then the appellants could amend up to one month after discovery closed, which makes no sense either. So there, um, uh, so if, if you just work it out with the rules, this, this strange interpretation of the, of the very clear order from the district court, it doesn't make any sense and, and tellingly the appellants have cite no authority to support its interpretation of the dispositive motion deadline as the deadline for amending pleadings with leave. They're just wrong in their reply brief at page four, when they say the ninth circuit, as well as a number of district courts have found or suggested that motions for leave to amend are in fact dispositive motions subject to that deadline. The cases that are cited there don't say that at all. The cases, all the cases that they cite do is, you know, with good reason deny motions for leave to amend that were filed on the eve of trial after the dispositive dispositive motions deadline. So their interpretation of the order makes no sense. Um, let's see the, um, I suppose the, as, um, Uh, I did want to point something out. I haven't heard any questions yet about this, but I did want to point out that, uh, we did know, uh, in their reply brief for the first time appellants raised a brand new issue, uh, concerning how the district court applied the summary judgment standard in connection with its review, um, of the estoppel defense. They appear to say in their reply brief, the SPI had the initial burden of negating that estoppel defense in its opening brief, and the court should have denied SPI's motion on that procedural basis, um, because the appellants are raising this issue for the first time in their reply brief, it should be deemed waived under ninth circuit authority. In the ARPAN case, uh, 261 F3rd 912, but I'm prepared having seen that if any of your honors is, uh, you know, concerned or want to have a question about that, I'm certainly prepared to address it. Neither of my colleagues want to question. Mr. Is it, did I say it's a levy? Yes. Thank you. Okay. Oh, we don't have any questions. Okay. Um, let's see. Uh, just trying to, so then we really come back to, uh, the rejection of the equitable estoppel defense, that that's really the core issue here. And, um, we've, I've already addressed the issue with the, you know, the first theory of that defense, uh, concerning the, um, ownership of the trademark. The second theory, which you questioned Mr. Zarin about, um, was about the approval issue. And I think the, the, the, the most important thing to recognize in connection with this approval issue is that it does not work as a, as a hook on the equitable estoppel defense because SPI's claims on which the district court granted summary judgment were not based on, on, uh, appellant's failure to obtain footwear approvals. They were rather based as Judge Rakoff pointed out on appellant's undisputed non-payment of guaranteed royalties and the advertising payments and appellant's unauthorized post-termination sales. Um, and so, uh, we made that very clear in the motion for summary judgment, um, precisely to avoid these factual issues that, um, that appellants, uh, seek to raise, um, on this point. Um, the, you know, thus the claim on which summary judgment was granted is not inconsistent with any alleged prior approval conduct or lack of conduct. Um, and, you know, I think the district court got it exactly right, uh, in the footnote where Judge Lasnik points out that, um, that appellants did not raise a possibility defense. That's kind of what this is sounding like, that somehow they couldn't make these payments because, you know, the, because SPI exercised its authority under the agreement to disprove of footwear samples that it believed did not meet its standards. Um, and, uh, uh, and Judge Lasnik points out that, you know, there was no impossibility defense in the case, but even if there were, Judge Lasnik pointed out that there were no facts to support it because it, the license agreement was very clear that it placed the approval in, uh, in the sole and absolute discretion of SPI. Um, so for all those reasons, Your Honor, we, uh, Your Honors, we ask that, uh, the court affirm the, uh, summary judgment decision. All right. Thank you. Um, we'll go back to Mr. Ceren. I gave you two minutes for rebuttal. Yeah, I, I just like to touch upon, I think three points Mr. Levy made. The first point was with respect to, um, the equitable estoppel defense. He had mentioned that it was more like a fraud and the inducement, uh, claim or defense, which, which had not been asserted. Um, this implicates that the issue of there being overlap between different types of defenses between a fraud and fraud defense and an equitable estoppel defense. Now, now, as I, as I explained in the brief and with supporting case law, equitable estoppel as a defense is in fact, a form of, of, of fraud. And the, the, the, the, the type of inconsistency here that Mr. Levy had, had, um, arguably mentioned, which is, which exists, which he claims does not, is the fact that when the as to whether or not it had, had ownership rights in the trademark with respect to footwear and it implied by issuing the license that it did. Um, and that is inconsistent with arguably the fact, the actual facts here, um, which, which it did not. And as, as I noted before, the, the, uh, you know, depositions bore that out and can support it. Um, and, and silence is in fact, a basis of equitable estoppel in, in Washington state. Another issue which had been raised was, uh, uh, double recovery. I note that, that, um, although, although it's factually correct that the request by SPI was for damages, uh, for 2018, the whole point of a liquidated damages, uh, uh, clause in an agreement is to, to, to ensure that if there's a breach by, uh, by the, the licensee, the licensee knows how much he or she is going to pay, which is so, so any additional royalties that might've accrued, accrued after the, after 2017, after the termination would have been, would have been, uh, um, considered by the parties when they, they, they incorporated the liquidated damages clause into the agreement in the first place. So, so the plaintiff, plaintiff SPI cannot now say that, uh, they want additional damages on top of those liquidated damages, which they claim were only. Well, just tell me if I did a Venn diagram, where's the intersection of the two types of damages? I don't see any intersection. They seem to be two separate things. Well, the, the, the, the, their, their, the intersection is that any, any sales that, that would have occurred after 2017, uh, the, the, the, the SPI holding would not have owed those royalties to, uh, to the license or SPI, because they were already incorporated into the liquidated damages provision, which required S3 holding to pay $140,000 in royalties in addition to another $20,000 in advertising fees. So let's, let's say the hypothetical, if, if in the converse, let's make it quick. I've already, you're already over quite a bit. So if in the converse, um, there had been no sales that occurred, let's say after January of 2017, then S3 holding still would have been required to pay that the entire $160,000, um, which would have been far in excess of, of, of the royalties that would have been generated in just that month of January of 2017. So, so it works both ways. Um, the, the SPI can't say, um, because there were royalties generated in 2018, it's entitled to those, but if, and, and, and the, and the, uh, royalties of for 2017 were incorporated into the liquidated damages clause, because the converse wouldn't have been the case, right? There, the, the, if there had been... Okay. All right. You're not hearing me. I gave you two extra minutes and now you're two over that. So, okay. Thank you. Um, unless either of my colleagues have any questions. Councilor, just Callahan, if you could forgive me, I do have just one more. Absolutely. 30 seconds. Um, earlier you were asked to walk through the elements of the, on the contract claim and you were asked, is it undisputed that your client continued to sale? And you said, yes, yet make sales. And you said, yes, but, so could you just quickly, what else, is there anything else you want us to know about that? Um, you, you agreed, but you seem to want to qualify the answer, right? Is there anything we're missing on that one? Um, well, the sales did cease at some point in mid 2018. And the reason that, that, uh, the, the, the, the, my client was unable to, again, unable to generate sufficient sales to pay the guaranteed minimum was because of the, the, the refusal of SPI to, uh, to, to approve the designs and the reversal of the, of those approvals. So, so, you know, that, that worked the equitable stopping. Thank you. All right. Thank you both for your argument. This matter will stand submitted and this court is now in recess until tomorrow at 930. Thank you. Thank you. Thank you, your honors.
judges: Callahan, Christen, Rakoff